LOVELL v. H. HENTZ & CO. et al.

(Circuit Court, N. D. Alabama, S. D. September 24, 1910.)

BANKRUPTCY (§ 172*)—PLEDGES—DELIVERY AND POSSESSION—COTTON SHIPPED TO ORDER OF PLEDGOR—RETENTION OF BILL OF LADING.

Bankrupts sold cotton for future delivery through defendants as brokers, and shortly prior to their bankruptcy they arranged to make advance shipments to defendants, on which defendants agreed to advance them a certain sum per bale. Under such arrangement bankrupts made a draft on defendants, attaching thereto a forged bill of lading for 200 bales of cotton, and defendants paid the draft. Later bankrupts directed their agent to ship 200 bales to defendants, marked as described in the forged bill of lading, and the shipment was made; but, in accordance with the usual custom of bankrupts, the bill of lading was taken to their own order, with directions to notify defendants. In the first place such bill was pledged to a bank in exchange for the warehouse receipts for the cotton which the bank held, but was later delivered to bankrupts, who held it at the time of the bankruptcy. Held, that the transaction by which bankrupts obtained payment of their draft on the forged bill of lading amounted to no more than an agreement to pledge the cotton called for therein, which could only be made effective by delivery; that, the bill of lading for the cotton shipped not having been indorsed to defendants, there was no such delivery, and the title remained in the bankrupts, and passed to their trustee in bankruptcy, who was entitled to recover the cotton or its value from defendants.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 172.*]

Action by William S. Lovell, trustee in bankruptcy of Knight, Yancey & Co., against H. Hentz & Co. and others. On motion of plaintiff for peremptory instructions. Motion granted.

Percy, Benners & Burr, for plaintiff.

Phelan Beale and Daniel Partridge, Jr., for defendants.

GRUBB, District Judge. In this case the material facts are not disputed. It is a question of what the law is applicable to that state of facts. Therefore it is my duty to decide the case.

By way of explanation I want to give my view of the facts and the application of the law. This suit grows originally out of a transaction between Knight, Yancey & Co., and H. Hentz & Co., by which Hentz & Co., as the brokers of Knight, Yancey & Co., sold 2,000 bales of cotton on the Cotton Exchange for Knight, Yancey & Co. to certain parties. It seems to me that the transaction, so far as Hentz & Co. and Knight, Yancey & Co. was concerned, was that of principal and agent, or principal and broker. While I believe the rules of exchange made Hentz & Co. responsible to the purchaser for the delivery of that cotton, yet, so far as the purposes of this case are concerned, I think the relation between Hentz & Co. and Knight, Yancey & Co. was that of broker and principal, and I do not think there was any agreement on the part of Knight, Yancey & Co. to sell Hentz & Co. this cotton, but that it was sold through them to other parties. Therefore it does not seem to me that the rights of the parties can be determined alone by that one transaction, the sale. Afterwards Knight, Yancey Co. wired Hentz & Co., asking if they would permit them (Knight, Yancey & Co.) to consign cotton, some of this 2,000 bales, in advance of the time fixed by the sale for its delivery—during the month of May—and if they consigned cotton under that arrangement how much Hentz & Co. would advance them on that cotton. Thereupon Hentz & Co. replied that they would permit them to consign the cotton and advance them $65 a bale, which I believe was $5 less than the market price. In pursuance of that arrangement, Knight, Yancey & Co. drew a draft on Hentz & Co. for $14,000, which is, I believe, more than $65 a bale; but anyway, in pursuance of the arrangement, they drew that draft, with a forged bill of lading attached calling for 200 bales of cotton. That was done under the authority Hentz & Co. had given them to consign the cotton to them as their brokers, they agreeing to make certain advances on that cotton. Upon receipt of the draft in New York, with the supposed bill of lading attached, it was paid by Hentz & Co. Thereby they made the advance of $14,000 on supposedly 200 bales of cotton marked "P O L."

As a matter of fact, the bill of lading was forged, and there was no cotton represented by it. Not only did the railroad in fact not receive the cotton, but the railroad agent did not execute the bill of lading. However, in my judgment, that constituted an agreement on the part of Knight, Yancey & Co. to secure an advance by the pledge of 200 bales of cotton. It was not a pledge, because the bill of lading was not genuine, and it was necessary for the completion of the pledge for it to be genuine. It was, however, as I say, in my judgment, an agreement to give a pledge. It was of no validity as to third parties until the pledge was delivered to Hentz & Co. An agreement to

pledge gives no specific lien on any property. You cannot have a pledge on all the cotton owned by Knight, Yancey & Co., without designating some particular bales. There is no claim that at the time the draft was paid Knight, Yancey & Co. had 200 bales marked "P O L." In fact, it was marked a month or more afterwards. You cannot have a lien on a floating lot of property. You have to identify the property. Therefore the agreement to pledge was not valid to give Hentz & Co. any right in any particular property without delivery. It only gave them a right as a general creditor against Knight, Yancey & Co. for the $14,000. It could, however, be made effectual by the subsequent delivery to or appropriation to Hentz & Co. of the 200 bales of cotton marked "P O L," if that was done before the rights of third parties intervened to the same cotton. In other words, it would be competent to complete the pledge by Knight, Yancey & Co. afterwards shipping 200 bales marked "P O L" to Hentz & Co., and that could be done any time before the rights of third parties intervened as to that 200 bales of cotton.

If, before there was any appropriation of the cotton in that sense, a creditor had stepped in and attached the cotton, his right would have come ahead of the rights of Hentz & Co., if at that time there had been no such appropriation of the 200 bales. The law gives the effect of an attachment to the filing of the petition in bankruptcy. Such filing puts all the property of the bankrupt in the custody of the bankrupt court; only, instead of being for the benefit of the attaching creditor only, it is for the benefit of all creditors. Therefore the time to determine whether there was an appropriation of the cotton to Hentz & Co. is the time of the filing of the petition in bankruptcy. That was April 20, 1910. In order, therefore, for Hentz & Co. to avail of their agreement with Knight, Yancey & Co. to pledge this 200 bales of cotton, it must appear in this case that after March 29th, when the draft was drawn, and before April 20th, when the petition in bankruptcy was filed, Knight, Yancey & Co. appropriated 200 bales of cotton to fulfill their obligation under that fraudulent bill of lading. If Knight, Yancey & Co., before the filing of the petition in bankruptcy, had appropriated this cotton, 200 bales in controversy, to their obligation under this fraudulent bill of lading, then the trustee in bankruptcy would not have title to the property. On the other hand, if there was no appropriation of this 200 bales, up to the time of the filing of the petition in bankruptcy, by Knight, Yancey & Co. to Hentz & Co. to meet their obligation under the forged bill of lading given to Hentz & Co., then the trustee would have title to the property, and have the right to recover the proceeds of its sale in this case. Therefore the question is whether there was an appropriation by Knight, Yancey & Co. to Hentz & Co. of this 200 bales of cotton marked "P O L" which is in controversy in this case, before the filing of the bankrupt proceedings.

My judgment is that the transaction was in the nature of an agreement to pledge, and in that case possession would be required to be delivered by Knight, Yancey & Co. to Hentz & Co. in order to make the appropriation. But if the transaction created a lien that did not

require for its validity possession to be in the lienee, there must still have been an appropriation or a separation of some cotton, and a designation of that cotton in some way, as being applied by Knight, Yancey & Co. under the forged bill of lading. There must be evidence to show that was done, in order to show appropriation as defined by law. I think it would be sufficient to meet that view of the law, if there was evidence tending to show that the bankrupts had marked the cotton "P O L," and separated it from other cotton; possibly if they had marked without separating it. If they had so identified 200 bales of cotton and marked it by mark, so as to indicate their intention to appropriate it under this forged bill of lading, then that would have been sufficient; and if the transaction had stopped with the mere marking it would have been an appropriation. So, if they had shipped the cotton on a straight bill of lading, consigning it to Hentz & Co., at any time before the petition in bankruptcy was filed, and put it in the possession of the carrier under such bill of lading, that would have been an appropriation to Hentz & Co., and they would have had a superior claim to the trustee. Or, if they had delivered it to the Southern Railroad, telling it they had an outstanding bill of lading, dated March 20th, that the railroad had no cotton to cover that bill of lading, and that they were delivering this cotton to cover it, that would have been an appropriation of the cotton to Hentz & Co. to cover the forged bill of lading, and would have given Hentz & Co. a superior title to the trustee in bankruptcy.

The character of the transaction is to be governed by the intention of Knight, Yancey & Co., as evidenced by their acts; that is, their executed intention, shown by their acts—not what Mr. Knight might have had in his mind, not disclosed by his outward acts, but his intention as gathered from the transaction. Now, what was the transaction by which the Southern Railroad Company got possession of this 200 bales of cotton on or about April 14th? It began with the instructions from Mr. Knight to Bailey to telephone Patterson at Selma to ship immediately, or as soon as possible, 200 bales of cotton marked "P O L" to Hentz & Co. In view of the practice and course of business of Knight, Yancey & Co., that meant to ship 200 bales, marked "P O L" to the order of Knight, Yancey & Co., notify Hentz & Co.; for the evidence is that the practice was universal on the part of Knight, Yancey & Co. to ship all their cotton "shipper's order notify." Now, when Mr. Knight told Bailey, and Bailey telephoned Patterson, to ship 200 bales marked "P O L" to Hentz & Co., in view of this course of business, it was a direction to ship, not to Hentz & Co., but to the order of the shipper, Knight, Yancey & Co., notify Hentz & Co., the order to be indorsed thereafter on the bill of lading by Knight, Yancey & Co. and transmitted to Hentz & Co. And it is clear, from the testimony, that when Mr. Knight told Bailey to tell Patterson to ship it immediately, or as soon as possible, he had in contemplation that it could not be shipped until the firm got that much free cotton at Selma.

The testimony of Frazer, representative of Hentz & Co., taken by deposition, shows that, when he asked Knight for the bills of lading at Selma, Knight told him he did not know whether he could get them

or not, because they might be in the bank. That makes it very clear to me he must have contemplated just the use that Mr. Patterson made of this bill of lading, even after having instructed Patterson to ship the cotton immediately to Hentz & Co. I do not think there is any violation of instructions shown by Patterson, in his treatment of this cotton, after having received these instructions from Knight; but, even had there been, I think the transaction would be governed by what was actually done by Patterson. Now, what did he do? When he got the instructions he went to the bank, which held the cotton warehouse receipts in pledge for money borrowed by Knight, Yancey & Co., got them, and carried them to the compress company, and had 200 bales of cotton marked up "P O L" and delivered to the railroad company, obtained bill of lading from the railroad company to the order of Knight, Yancey & Co.—not Hentz & Co.—and took that bill of lading and repledged it to the bank in lieu of the cotton warehouse receipts which he had taken out. That was not an appropriation of that 200 bales of cotton to Hentz & Co. The bank undoubtedly would have a good title to the cotton as long as they retained the bill of lading. If that be true, it must be on the idea that Knight, Yancey & Co. retained control and disposition of that cotton. So long as the Selma bank held this bill of lading, it is clear to me there was no appropriation of that cotton by Knight, Yancey & Co. to Hentz & Co. This cotton was released, however, by the bank before the petition in bankruptcy was filed. How many days before it does not appear— probably only one day; and the bill of lading then went back into the possession of Mr. Patterson, as the agent of Knight, Yancey & Co. Patterson retained possession until the petition in bankruptcy was filed, and the bill of lading was delivered by him to the receiver in bankruptcy. Had there been no evidence as to what the contemplated use of that bill of lading was, after it was released by the bank to Patterson, I think his retention of the bill of lading would show that the cotton represented by the bill of lading continued to be within the power and disposition of Knight, Yancey & Co. The cotton was with the Southern Railroad. The railroad is always the agent of either the consignor or consignee. In this case Knight, Yancey & Co. was both the consignor and consignee. Therefore the possession of the railroad was the possession of Knight, Yancey & Co. Not only that, but Knight, Yancey & Co., so long as they retained the bill of lading, had the right to strike out the blank indorsement and have the cotton delivered to them. Hentz & Co. had no legal right to control the movement of the cotton or its delivery at any time while the bill of lading remained in the possession of Knight, Yancey & Co. Had they transmitted the bill of lading indorsed in blank, to Hentz & Co., a different question would have arisen. That would have been authority for Hentz & Co. to go and get the cotton, and the railroad would have become the agent of Hentz & Co; the possession in the railroad thereby being changed from that of Knight, Yancey & Co. to that of Hentz & Co. But that was never done up to the time the petition was filed.

Then, in addition to this, it was contemplated that that bill of lading would be used again by the bankrupt, because Patterson says the

practice was, in all cases, to transmit the bill of lading from Selma to Knight, Yancey & Co., at Decatur. In other words, what he would have done with the bill of lading, had he carried out the intention of Knight, to eventually let Hentz & Co. get the cotton, would have been to deposit that bill of lading in the Selma bank, with draft attached on Knight, Yancey & Co., at Decatur, and the bank, in Selma, would have given the account of Knight, Yancey & Co., at Selma, credit for that draft. When it reached Decatur, had this bankruptcy not intervened, Knight would have taken up the draft and thereby secured the bill of lading, and while in ordinary cases he would have drawn on Hentz & Co. with the genuine bill of lading attached, in this case, as he had already cashed the draft, he would not have drawn any draft, but would have suppressed the bill of lading. However, until Knight got possession of it by that means, the bill of lading was a thing having vitality. If it had been used in the way contemplated, to get the cotton to Hentz & Co., yet before it ever got into the hands of Hentz & Co. it was contemplated it was to be negotiated by the bankrupt by putting it in the bank at Selma and drawing on Knight, Yancey & Co., at Decatur, with that attached. Therefore it seems to me that, until the bill of lading reached Knight's hands and was suppressed, it cannot be said it effected any appropriation of this cotton to Hentz & Co., because the use contemplated by the bankrupts up to that time shows that they retained authority to dispose of the property and sell it, or do what they pleased with it. It is inconsistent with the idea they had appropriated it to Hentz & Co., because it is clear they had retained the right to do what they pleased with it up to that time. If it had been delivered to Knight before the petition in bankruptcy was filed, and he had suppressed it, then it seems to me it might have been considered an appropriation of the cotton represented by it. If that case had ever arisen, it was not intended that Hentz & Co. would ever get the cotton on the genuine bill of lading at all. Knight intended to keep that out of sight, on the idea that, after the cotton had been delivered to the railroad company, it would in the course of the business be delivered to Hentz & Co. on the forged bill of lading—in other words, the forged bill of lading would have gone through as a genuine one. At the time the petition in bankruptcy was filed, if Knight had actually taken up at the Decatur bank the draft with this genuine bill of lading attached to it, and suppressed the genuine bill of lading, I think it would be a fair inference that he did that with the intention to effect an appropriation of the cotton to Hentz & Co. under the forged bill of lading; but I cannot see how that could be true so long as the genuine bill of lading was outstanding, and was being used on the idea that the bankrupts controlled the cotton represented by it. I cannot see how it can be reconciled that they appropriated the cotton to Hentz & Co.—which means they parted with ownership and control— with the fact that they kept the bill of lading, which gave them the right to ownership and control, and exercised that legal right by disposing of the cotton to the Selma bank, and in the course of business would have disposed of it again to the Decatur bank, in order to get it to Knight. For that reason it seems to me that the title to the cotton, at the time the petition in bankruptcy was filed, was in Knight;

Yancey & Co.   If that is true, it is vested in the trustee in bankruptcy, and, while Hentz & Co. have a claim against them for being defrauded on this draft, they have just such a claim as unsecured creditors have, because the right never passed to this particular lot of cotton, the 200 bales marked "P O L."

I have said, in the course of my remarks in this case, that the marking of the cotton "P O L" might in and of itself be sufficient to appropriate it to Hentz & Co.   That would be true, if that was the entire transaction.   But in this case it was not the entire transaction.   The transaction commenced with the instructions given by Knight to Bailey, and ended with the disposition of the bill of lading at the time of the filing of the petition in bankruptcy.   The marking was a part of that transaction, and only a part of it.   In getting at the legal effect of the transaction, you do not consider one part only and discard the rest.   Taking it all together, the legal effect was not to give ownership to Hentz & Co., but to retain ownership in the bankrupts. For these reasons, it seems to me that the plaintiff is entitled to recover in this case, as trustee of Knight, Yancey & Co., the bankrupts.   And while Hentz & Co. have a claim against Knight, Yancey & Co., on the draft, it is not a claim that attaches to this 200 bales of cotton, or gives them any better right in the proceeds of this 200 bales of cotton, than other unsecured creditors have, because there never was a time, before the petition in bankruptcy was filed, when it could be said that this cotton was appropriated by Knight, Yancey & Co. to the payment of their obligation to Hentz & Co. under the forged bill of lading.

The court charges the jury that, if they believe the evidence, they must find a verdict for the plaintiff, and the form of the verdict will be, "We, the jury, find for the plaintiff in the sum of $15,136.16," one of their number to sign it as foreman.